UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 5:21-CV-00045-DCR-EBA

CARLTON T. GALLMAN,                                                      PLAINTIFF,

V.                  **REPORT AND RECOMMENDATION**

WILLIAM THOMPSON, JR.,                                    DEFENDANT.

*** *** *** ***

Plaintiff Carlton T. Gallman, proceeding *pro se*, filed a civil complaint pursuant to 42 U.S.C. § 1983 alleging an official from the Lee Adjustment Center ("LAC") assaulted, mistreated, and threatened him in violation of the Eighth Amendment. [R. 1 at pg. 4]. Currently before the Court is Defendant Correctional Officer William Thompson, Jr.'s motion for summary judgment [R. 73]. The matter is fully briefed, and following a review of the record, the undersigned **RECOMMENDS** that summary judgment be granted in favor of the Defendant.

## I. FACTS AND PROCEDURAL HISTORY

This action arises from events that allegedly took place on December 22, 2020 at the LAC in Beattyville, Kentucky, where Gallman was detained. The presiding judge, after reviewing Gallman's Complaint pursuant to 28 U.S.C. §§ 1915, 1915A, dismissed the claims against CoreCivic (the private corporation that operates LAC), and Lieutenant Jayson Kenner. [R. 7]. Thus, the only remaining claims are against Defendant Thompson, which the Court construed as an Eighth Amendment claim alleging cruel and unusual punishment. [*Id.*].

Gallman's account of the events underlying his Complaint is somewhat difficult to follow.

He alleges that that Defendant Thompson was making aggressive and threatening remarks toward him, and that Gallman retreated to his cell to avoid Thompson's provocations. [R. 1 at pg. 2]. Thompson allegedly followed Gallman into his cell, where he assaulted Gallman by excessively spraying him with O/C spray. [*Id.*]. Two hours later, four officers took Gallman to the restricted housing unit ("RHU") caseworker's office and allegedly attempted to intimidate him into not lodging a grievance. [*Id.*]. As retaliation, Gallman asserts that he was put in isolation for about a week. [*Id.*].

In his Answer, Thompson raised several defenses and affirmative defenses, including that Gallman's action should be barred due to his failure to exhaust administrative remedies. [R. 11 at pg. 3]. Indeed, when he was released following the December 22, 2020 incident, Gallman filed a grievance on December 31, 2020, alleging "[u]nfair or [d]iscriminatory [t]reatment." [R. 1-1 at pg. 1]. It was denied as non-grievable because Gallman filed the grievance more than five business days after the incident. [*Id.* at pg. 2]. Throughout the record, Gallman maintains that he was unable to timely file his grievance prior to the five-day deadline because he was in isolation without access to resources required to file his grievance, such as pen and paper. *See* [R. 1-1 at pg. 3, 9; R. 78 at pg. 1–2]. Gallman appealed the denial, but the appeal was denied and LAC administrators informed him the claim could go no further because his grievance was not timely. [R. 11 at pg. 7].

Gallman filed the instant action on February 12, 2021 against CoreCivic, Lt. Kenner, and Defendant Thompson, alleging violations of the Eighth Amendment when Defendant Thompson "assault[ed] . . . a mentally ill inmate," which he alleges amounted to cruel and unusual punishment. [R. 1 at pg. 4]. As relief, Gallman requested that the United States Attorney investigate his allegations, the appointment of counsel to argue his claims, and for "CoreCivic [to be] held accountable" for his alleged injuries and "covering [the incident] up." [*Id.* at pg. 8]. He requested compensatory damages between $1 and $10,000,000 dollars. [*Id.*].

## II. STANDARD OF REVIEW

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such a motion then "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). This is so because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24. To avoid summary judgment, the non-movant must come forward with evidence on which a jury could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The following factors bear consideration by a court when entertaining a motion for summary judgment:

> 1. Complex cases are not necessarily inappropriate for summary judgment.
>
> 2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> 3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.
>
> 4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> 5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

> 6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion.
>
> 7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.
>
> 8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> 9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> 10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). "[T]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251). Any inferences that may permissibly be drawn from the evidence and facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where the record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). In such a case, summary judgment is warranted. *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010); *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

#### A. Exhaustion of Administrative Remedies

Actions filed by prisoners confined in any jail, prison or correctional facility are governed by the Prison Litigation Reform Act of 1995 (PLRA), under title 42 U.S.C. §1983. The PLRA was enacted to combat the sharp uptick in prisoner litigation in federal courts, primarily by adding a more stringent exhaustion provision, 42 U.S.C. § 1997e. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). The PLRA provides, in relevant part,

> No action shall be brought with respect to prison conditions . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement modified the discretionary power held by district courts in determining whether prisoners had exhausted administrative remedies prior to filing suit. *Woodford*, 548 U.S. at 85. Now, prisoners must exhaust all *available* remedies, "not just those that meet federal standards." *Id.*

In *Woodford*, the Supreme Court explicitly rejected the notion that an administrative remedy can become unavailable purely because a prisoner ran out of time to utilize the administrative remedy. *Id.* at 87 (reconciling circuit split and overruling in part Sixth Circuit opinion *Thomas v. Woolum*, 337 F.3d 720 (6th Cir. 2003)). The Court's rationale for a stringent reading of the PLRA was that a prisoner could intentionally allow the deadline to file a grievance pass, proceed directly to federal court, and, consequently, bypass the administrative process

altogether. *Id.* at 95.

Following *Woodford*, the Supreme Court in *Ross v. Blake* further rejected the principle advanced by some courts of appeals that there could be a "special circumstances" under which a prisoner's failure to comply with administrative procedural requirements could be justified. *Ross v. Blake*, 578 U.S. 632, 637 (2016). The Court instead determined that the PLRA provides an internal mechanism for relief by only making exhaustion mandatory when an administrative remedy is "available." *Id.* at 643. Accordingly, the Court recognized three instances where an administrative remedy may become "unavailable" for the purposes of the PLRA, such that the untimely filing of a grievance would not amount to a prisoner failing to exhaust his or her administrative remedies. First, "an administrative remedy is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, an administrative remedy is unavailable when the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

In exhaustion cases, the party moving for summary judgment "carries the initial 'burden of showing that there was a generally available administrative remedy, and that the prisoner did not exhaust that remedy.'" *McDowell v. Mattingly*, Civil Action No. 3:20-cv-383-CHB, 2021 U.S. Dist. LEXIS 102540, at *8 (W.D. Ky. June 1, 2021) (quoting *Bennett v. Mich. Dep't of Corr.*, No. 15-14465, 2017 U.S. Dist. LEXIS 120134, 2017 WL 3208591, *5 (E.D. Mich. July 24, 2017)). "Once the moving party satisfies this burden, the non-moving party must 'come forward with evidence showing that there is something in his [or her] particular case that made the existing and generally available remedies effectively unavailable to him [or her].'" *Id.* (alteration in original).

The principal basis for Thompson's motion for summary judgment is that, because Gallman failed to timely file his grievance, his claims are barred due to a failure to exhaust administrative remedies. [R. 73-1 at pg. 3]. Gallman admits that he did not fully exhaust the grievance process, but that the untimely filing of his initial grievance on December 31, 2020, was due to being held in isolation without access to resources needed to file his grievance. Thus, whether Gallman's claims are barred turns on whether Thompson meets his initial burden to show Gallman generally had access to a remedy, and whether Gallman can demonstrate that the remedy was effectively unavailable to him during the period he needed to file his grievance, between December 22, 2020 and December 30, 2020.

Here, the parties seem to agree that, generally, there was an administrative remedy available in instances where an inmate alleges assault by an LAC employee. This is evidenced by multiple grievance forms completed by Gallman contained within the record (including the grievance form relating to the events underlying the instant action) and Thompson's provision of the LAC Inmate Grievance Procedure. [R. 73-2 at pg. 20]. Thus, the burden shifts to Gallman to demonstrate that the appropriate administrative remedy was effectively unavailable to him. Gallman, as the non-moving party, must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995)

Before addressing whether Gallman has met his burden, it is worth noting the exact policy to which LAC inmates are required to adhere pursuant to the PLRA. At the LAC, grievances which allege unfair or discriminatory treatment must be filed within five business days after the incident occurs.[1] [R. 73-2 at pg. 27 ¶ 1(a)(2)]. The policy also provides that "[a] third party,

---

[1] The policy defines "business days" as Monday through Friday, excluding holidays. [R. 73-2 at pg. 20].

including a fellow inmate, staff member, attorney, or outside advocate, may assist an inmate in filing a grievance and shall be permitted to file such a request on behalf of the other inmate." [*Id.* at pg. 28 ¶ 1(a)(14)]. Here, the events underlying Gallman's allegations took place on Tuesday, December 22, 2020. Considering the Christmas holiday on Friday, December 25, 2020, and the intervening weekend, Gallman's grievance should have been filed five business days later, on December 30, 2020. He did not file the grievance until December 31, 2020, one day after the deadline.[2]

As Gallman could have filed a grievance between December 22, 2020 and December 30, 2020, Thompson asserts that his untimely filing amounts to a failure to exhaust an available administrative remedy, which is "fatal" to his § 1983 claims. [R. 73-1 at pg. 3]. Gallman, however, invokes *Ross v. Blake* and asserts that "[t]here were no remedies available to exhaust" because he did not have access to the means necessary to properly file a grievance, such as a pen, paper, or LAC grievance aid. [R. 78 at pg. 1–2] (citing *Ross v Blake*, 578 U.S. 632 (2016)). In his Complaint, Gallman asserted that, following the December 22, 2020 incident, he was placed in isolation in the LAC restricted housing unit ("RHU") for approximately a week with "no seg. allowables," including pen or paper. [R. 1 at pg. 3]. In his deposition, Gallman stated that RHU residents were generally allowed pen and paper, but that he was not allowed pen and paper for a week to ten days following the December 22, 2020 incident. [R. 77 at pg. 23]. In support of his assertion that the grievance procedure was effectively unavailable, Gallman provided an affidavit from LAC Grievance Aide Marshall Brooks, Jr., who stated that he was not allowed to visit the RHU "past the 'front entry door,' so inmates there were forced to 'mail in' their grievances (when

---

[2] For the purposes of calculating the five-day period, Thompson offered an affidavit from LAC Compliance Coordinator Mitchell Bradenburg, which states that neither Christmas Eve (Thursday, December 24, 2020) nor New Year's Eve (Thursday, December 31, 2020) were observed as holidays. [R. 73-2 at pg. 3].

they could even get forms)[.]"[3]  [R. 78-1 at pg. 6].

Gallman's assertion that he did not have access to a grievance aid following the December 22 incident, along with Brooks' affidavit, directly conflicts with video footage of Brooks being escorted into the RHU and visiting Gallman at his cell on December 29, 2020.[4]  [R. 73-4 at pg. 4–10].  Additionally, the record reflects that multiple case managers visited the RHU between December 23, 2020 and December 29, 2020, including Tenicia Hays.  [R. 73-2 at pg. 51].  Hays visited Gallman on December 29, 2020 and attempted to conduct a seven-day review following his placement in the RHU.  The LAC action log for the relevant date indicates that Gallman "refused to participate in the review process, but [he] stated that he was good and needed nothing." [R. 73-2 at pg. 57].  Hays' affidavit authenticates the log, and further adds that "one of the roles of a case manager [is] to provide assistance" to inmates by "providing grievance forms, paperwork[,] and pencils in order to complete [the grievance] process."  [R. 73-3 at pg. 2].  Gallman's response to Thompson's motion does not refute that he was visited by Hays or that he rejected the opportunity to participate in a post-incident review, or that he failed to ask for assistance in filing his grievance on December 29, 2020.

In considering a motion for summary judgment, the Court must view the facts and draw all inferences in the light most favorable to the non-moving party.  *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 948 (6th Cir. 2016).  Here, there is uncontradicted evidence that Gallman did not

---

[3] Although at this stage of litigation the Court is not tasked with assessing the credibility of evidence offered in support or in opposition to a motion for summary judgment, the Court will note that the Marshall Brooks, Jr.'s affidavit is vague as to time.  Brooks solely offers that he was the grievance aide "during the COVID-19 lock-down (before, during & after)."  [R. 78-1 at pg. 6].  Marshall's affidavit does not specifically identify that he is referring to the time period surrounding Gallman's claims.  However, the Court will view the affidavit in the light most favorable to Gallman, and construe Brooks' statements as referring to the December 22, 2020 through December 30, 2020 period.
[4] The record contains still photographs of the video footage showing Brooks traversing through the RHU, and the photographs were authenticated by LAC Compliance Coordinator Mitchell Brandenburg.  *See* [R. 73-4 at pg. 2–3].

file a timely grievance, as required by the LAC grievance procedure. The grievance form itself indicates that it was signed and filed on December 31, 2020. [R. 73-2 at pg. 6]. Gallman's Complaint further admits that he filed his grievance on that date. [R. 1 at pg. 5].

Although the late filing of Gallman's grievance is not disputed, Gallman does aver that his claims should survive summary judgment because the LAC grievance procedure was not "available" to him. [R. 78]. Gallman's assertion that he had no access to the means necessary to timely file his grievance is strongly refuted by the evidence in the record. At best, Gallman has offered a "mere scintilla" of evidence showing that the grievance procedure was effectively unavailable to him, and such a showing is insufficient to survive a motion for summary judgment when "the evidence . . . is so one-sided that one party must prevail as matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Here, Thompson has presented ample evidence that the grievance procedure was available, including records indicating Gallman was visited by a grievance aide and LAC case managers prior to the deadline to file his grievance. Thus, the Court finds that there is no genuine dispute of material fact as to whether administrative remedies were available to Gallman. Thompson has demonstrated that no reasonable juror could find that Gallman properly exhausted his administrative remedies, and thus granting summary judgment in Thompson's favor is appropriate. *See McDowell v. Mattingly*, Civil Action No. 3:20-cv-383-CHB, 2021 U.S. Dist. LEXIS 102540, at *12 (W.D. Ky. June 1, 2021) (holding Plaintiff's failure to exhaust administrative remedies "alone is a sufficient basis for granting summary judgment in Defendants' favor.") (citing *Arflack v. County of Henderson*, 412 F. App'x 829, 831–32 (6th Cir. 2011) (affirming district court's granting of summary judgment as to a § 1983 claim when an inmate "failed to exhaust his administrative remedies prior to initiating litigation")).

**B. Merits of Thompson's Motion for Summary Judgment**

Although Gallman's claims are barred solely due to the untimeliness of his grievance, and the resulting failure to exhaust his administrative remedies, the Court will also consider the merits of Thompson's motion for summary judgment.

It is well-settled law that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Rhodes v. Michigan*, 10 F.4th 665, 673 (6th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The Eighth Amendment prohibits cruel and unusual punishment, and therefore "protects prisoners from the unnecessary and wanton infliction of pain." *Rafferty v. Trumbull Cty.*, 915 F.3d 1087, 1093 (6th Cir. 2019) (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). "'[U]nnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Id.* at 1094 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Neither the Supreme Court nor the Sixth Circuit have ever held that the use of a chemical agent (like O/C spray) on a prisoner is a per se violation of the Eight Amendment. *Caldwell v. Moore*, 968 F.3d 595, 600 (6th Cir. 1992).

To successfully make a claim under the Eighth Amendment, a prisoner must show: (1) that objectively, the pain inflicted was "sufficiently serious"; and (2) that, subjectively, the prison official acted with a "sufficiently culpable state of mind." *Id.* (citing *Williams v. Curtain*, 631 F.3d 380, 383 (6th Cir. 2011); *Farmer*, 511 U.S. at 834). An injury is sufficiently serious not simply because the contact between a prisoner and prison guard is "malevolent," as "the Eighth Amendment protects prisoners only from that conduct which is 'repugnant to the conscience of mankind.'" *Id.* (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010)). Moreover, a prison official has a sufficiently culpable state of mind when the prisoner can show that the official acted "maliciously," "sadistically," and "for the very purpose of causing harm." *Id.* (quoting *Hudson v.*

*McMillian*, 503 U.S. 1, 6 (1992)).

The Sixth Circuit has rejected claims that a prisoner's Eighth Amendment rights were violated when a prison official "app[lied] force 'in a good-faith effort to maintain or restore discipline.'" *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004). For instance, in *Jennings*, the Sixth Circuit affirmed the district court's grant of summary judgment in favor of two correctional officers under circumstances similar to the case at bar. There, the plaintiff alleged the officers violated his Eighth Amendment right against cruel and unusual punishment when they sprayed him with a chemical agent in response to his refusal to exit a facility shower. *Jennings*, 93 F. App'x at 724. The court determined that, based on video evidence, the plaintiff had "disobeyed repeated direct orders prior to the use of pepper spray." *Id.* at 725. Moreover, the plaintiff did not suffer injury (such as respiratory distress) beyond the discomfort ordinarily experienced by persons exposed to pepper spray. *Id.* Because of the plaintiff's failure to show more than a *de minimis* physical injury, the court denied the claim for "mental anguish" pursuant to 42 U.S.C. § 1997e(e), which bars any claim by a prisoner of mental or emotional injury "without a prior showing of physical injury or the commission of a sexual act." § 1997e(e).

Here, Thompson has made a significant showing that there was a penological purpose to his deployment of the O/C spray on December 22, 2020, and that Thompson did not sustain injuries beyond the *de minimis* exposure to O/C spray. Thompson states that he was delivering food to the inmates housed in the LAC L-Wing when Gallman approached to pick up his lunch. [R. 73-1 at pg. 10]. Thompson noticed that Gallman had picked up a tray designated for another cell, and told Gallman as much. [*Id.*]. Gallman apparently reacted by slamming the tray down and cursing at Thompson. [*Id.*]. Later, Thompson went to Gallman's cell to write him up for the incident involving the food tray. [*Id.*]. He asked Gallman for his identification number, which then led to

Gallman threatening Thompson. [*Id.* at pg. 11]. While Thompson claims he did not enter Gallman's cell, he saw Gallman reach for his locker to grab a padlock, a potential weapon. [*Id.*]. Thompson then pulled out his pepper spray, and Gallman continued to move toward him. [*Id.*]. It was at that time that Thompson sprayed Gallman, one time and "very briefly." [*Id.*]. Then, Gallman started chasing Thompson through the lower level of the wing. [*Id.*]. Thompson finally states that the further use of the O/C spray followed "aggressive, threatening actions by Gallman," which is documented in the surveillance footage. [*Id.*].

The record, including Gallman's Complaint and subsequent filings, do not demonstrate that he suffered a sufficient injury to sustain an Eighth Amendment claim of cruel and unusual punishment. The first alleged injury is from the O/C spray itself. To address this allegation, Thompson submitted an affidavit from the nurse who treated Gallman on December 22, 2020, Teresa Chaney. Chaney stated that she "checked [Gallman] for injuries from the incident on that date and he had none." [R. 73-7 at pg. 2]. Further, Chaney stated that Gallman had been exposed to chemical spray, but he was decontaminated and given further instructions to self-decontaminate. [*Id.*]. Like in *Jennings*, Gallman's records do not reflect that he suffered an injury (such as respiratory distress) other than the mere exposure to a chemical agent. And, also as in *Jennings*, Thompson was responding to what he perceived as aggressive and threatening behavior exhibited by Gallman.

The second alleged injury is Gallman's injured finger. As an attachment to his Complaint, Gallman offers a copy of an Authorization for Release of Patient Information, wherein Gallman requested "Broken finger x-rays" from December 30, 2020 and "pics by Sgt. Spencer in Seg A 105" from December 22, 2020. [R. 1-1 at pg. 4]. Gallman indicated that the purpose for the disclosure was "evidence of assault." [*Id.*]. Any claim that the injured finger or hand resulted from the December 22, 2020 incident involving Thompson is plainly refuted in the record, by

Page 13 of 16

Gallman's own testimony. In his deposition, Gallman repeatedly stated that there was no physical contact between him and Thompson during the incident. [R. 77-1 at pg. 80–81]. Gallman further stated unequivocally that Thompson did not break his finger, and that his whole hand was broken prior to the incident from playing basketball. [*Id.* at pg. 85–86]. Gallman further stated that, while the x-rays of his hand were taken after the December 22, 2020 incident, the injuries to his hand were merely exacerbated by other guards—not Thompson—taking him to "the hole" following the incident. [*Id.* at pg. 87–88].

In sum, the record demonstrates Thompson did not inflict injuries upon Gallman during the December 22, 2020 incident which would rise to the level of an Eighth Amendment claim. Thompson's motion and supporting documents, along with the surveillance footage which corroborates his version of the events on December 22, 2020, meet the threshold for an initial showing that there is no genuine dispute of material fact that he was justified in deploying a chemical agent in response to Gallman's threatening behavior. Thus, the burden shifts to Gallman to demonstrate that there remains a genuine issue regarding his Eighth Amendment claim.

Gallman has failed to offer any evidence beyond self-serving statements that that Thompson acted maliciously, sadistically, or for the purpose of causing harm. These statements, without any additional support, constitute a "mere scintilla" of evidence, and do not demonstrate that there remains a genuine issue of material fact. Rather, Gallman's response to Thompson's motion for summary judgment primarily references video footage that he alleges CoreCivic, who is no longer a party to this action, destroyed or lost in order to obfuscate what occurred on December 22, 2020.[5] After examining the motion for summary judgment, pleadings, and the record in its entirety, the Court finds that no reasonable juror could find that Gallman's Eighth

---

[5] The video footage of the incident was filed into the record on December 21, 2021. [R. 76].

Page **14** of **16**

Amendment rights were violated, or that Thompson would be responsible for such a violation.

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned concludes that Gallman failed to exhaust his administrative remedies prior to initiating this action in federal court. Further, Gallman has failed to demonstrate that such remedies were unavailable to him due to a recognized circumstance identified by the Supreme Court in *Ross v. Blake*, 578 U.S. 632 (2016). Even if Gallman had timely filed his grievance, the undersigned further finds that summary judgment in Thompson's favor would still be proper given that there remains no genuine dispute of material fact. Having fully considered the matter, and the Court being otherwise sufficiently advised,

**IT IS RECOMMENDED** that Defendant Thompson's motion for summary judgment [R. 73] be **GRANTED**.

*** *** *** ***

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Recommended Disposition. Particularized objections to this Recommended Disposition must be filed with the Clerk of the Court within fourteen days of the date of service or further appeal is waived. Fed. R. Civ. P. 72(b)(2); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). A general objection that does not "specify the issues of contention" is not enough to satisfy the requirement of written and specific objections. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are not enough to preserve the right of appeal. *Howard v. Secretary of HHS*, 932 F.2d 505, 508–09 (6th Cir. 1991). A party may respond to another party's

objections within fourteen days of being served with a copy of those objections. Fed. R. Civ. P. 72(b)(2).

Signed March 22, 2022.



Signed By:
*Edward B. Atkins*
United States Magistrate Judge